IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KEVIN HORNER, | § | |
| CHARLES HARTMAN, and | § | |
| JOHN KRAKOWSKI, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| AMERICAN AIRLINES, INC., and | § | |
| ALLIED PILOTS ASSOCIATION, | § | |
| | § | |
| Defendants. | § | |

## <u>PLAINTIFFS' ORIGINAL COMPLAINT FOR INJUNCTIVE RELIEF</u>

Plaintiffs Kevin Horner ("Horner"), Charles Hartman ("Hartman") and John Krakowski ("Krakowski") (collectively referred to herein as "Plaintiffs") file this Original Complaint for Injunctive Relief against Defendants American Airlines, Inc. ("American") and Allied Pilots Association ("APA") (collectively referred to herein as "Defendants") as follows:

### <u>Introductory Statement</u>

1.      Plaintiffs provide this brief statement to summarize the complex set of facts alleged, and the exigencies Plaintiffs face as a result of Defendants' conduct as alleged.

2.      American Airlines, Inc. ("American") acquired Trans World Airlines ("TWA") in 2001.  Plaintiffs are former TWA pilots currently flying for American. American's pilots are represented by Defendant Allied Pilots Association ("APA").  Ever since the 2001 acquisition, Defendants have unfairly discriminated against the former TWA pilots as a group.  This case presents the latest example of that discrimination.

3.      Three American pilots have filed grievances that, if successful, would cause Plaintiff Horner to be demoted from Captain to First Officer ("co-pilot").  At least 85 other

former TWA pilots would suffer the same fate, and the careers of 800-plus other former TWA pilots, including Plaintiffs Hartman and Krakowski, would also be substantially damaged if the grievances are successful.

4.      The pilots' grievances directly conflict with Defendants' previously stated position on the contract issue presented.  Such grievances are generally summarily denied by American, and not submitted to arbitration.  Yet, on February 6, 2017, Defendants submitted the grievances for an expedited arbitration to begin on March 14, 2017 before a single arbitrator they selected.  In doing so, Defendants dispensed with the entire grievance process required by their Collective Bargaining Agreement ("CBA").  Further, although the grievants' claims misconstrue certain material terms and provisions of the Defendants' CBA, Defendants inexplicably refuse to present evidence of their contractual intent at the hearing.

5.      Defendants' highly suspect process for these expedited grievances violates the CBA in numerous ways, and violate the Railway Labor Act.  Plaintiffs thus protested by filing grievances under the CBA.  However, Plaintiffs' grievances will not be resolved before Defendants' unlawful expedited arbitration is concluded.  Plaintiffs thus seek to enjoin the arbitration in order to preserve the status quo, and their rights to grieve.

## Parties

6.      Plaintiff Kevin Horner is a natural person residing in Pike County, Missouri.

7.      Plaintiff Charles Hartman is a natural person residing in Hays County, Texas.

8.      Plaintiff John Krakowski is a natural person residing in St. Louis County, Missouri.

9.      Defendant American Airlines, Inc. is a Delaware corporation which operates an international airline, and does business and has an operations base in this District.

10.     Defendant Allied Pilots Association is an unincorporated association and labor organization maintaining its headquarters in this District.   APA is the certified collective bargaining agent for American's pilots.

11.     Plaintiffs are pilots employed by American.

## Jurisdiction and Venue

12.     Plaintiffs' claims arise under the Railway Labor Act ("RLA"), 45 U.S.C.  §§ 151, *et seq*.  As a result, the Court has subject matter jurisdiction over this request for injunctive relief.

13.     Venue is proper pursuant to 28 U.S.C. § 1391 (b) and (c) since Defendants may be found in this District.

## Factual Statement

14.     In April 2001, American acquired TWA's assets, including its aircraft, routes and unionized employees.  Plaintiffs were TWA pilots at the time of the acquisition.

15.     Ever since the April 2001 acquisition, the former TWA pilots, as a group, have been unfairly discriminated against by American and APA.  This case is the latest example of the Defendants' unfair treatment of the former TWA pilots.

16.     Shortly after the acquisition, in November 2001, American and APA executed "Supplement CC" to their CBA, which supplement controlled the former TWA pilots' placement on the American pilot seniority list.

17.     Seniority is critical to a pilot's career, as seniority controls a pilot's rank, type of aircraft flown, bid awards, and schedule, all of which directly impacts his or her pay and quality of life.  The seniority placements Defendants gave the former TWA pilots were exceptionally unfair, and damaged the careers of nearly all of them.

18.     Pursuant to Supplement CC, approximately 1,200 of the former TWA pilots (55%

of the total group) were simply "stapled" to the bottom of the American seniority list, and given no credit for their TWA seniority.  All of these pilots were ultimately furloughed after the terrorist attacks of 9-11 resulted in massive layoffs in the airline industry.  The remaining 1,100 former TWA pilots were integrated into the American seniority list, but in a manner by which they retained only a fraction of the seniority they accumulated at TWA.  Most of these pilots suffered demotions, and many were furloughed as well.

19.     APA rightfully acknowledged at the time that the former TWA pilots' seniority placements were not "equitable."  So to partially ameliorate those inequities, Supplement CC included a protective "fence" in St. Louis (TWA's former hub).  This "fence" created a minimum number of Captain and First Officer positions in St. Louis that were reserved to former TWA pilots.

20.     Like most of the large commercial air carriers, American began to downsize after the events of 9-11, and as American's downsizing was effectuated, American desired to reduce or eliminate its St. Louis base, and to concurrently reduce the flying reserved in St. Louis to the former TWA pilots pursuant to Supplement CC.

21.     For its part, APA desired to terminate the flying reserved in St. Louis to former TWA pilots in order to unfairly and improperly benefit the much larger group of "legacy" American pilots. While Supplement CC prevented American and APA from taking these predatory actions, American's 2011 bankruptcy created an opportunity for Defendants to change the status quo.

22.     In November 2011, American filed its bankruptcy petition in the Southern District of New York.

23.     Subsequent to its bankruptcy filing, American and APA negotiated for a new

CBA.  When they initially failed to reach an agreement, American moved to reject its existing CBA pursuant to Bankruptcy Code § 1113.

24.     American's § 1113 motion was granted September 12, 2012, and American immediately rejected its CBA with APA, including Supplement CC.

25.     American then resumed negotiations with APA for a new CBA.  An agreement was reached, and approved by the Bankruptcy Court in December 2012.

26.     The new CBA did not include Supplement CC's "fence," or any other equivalent protected flying for the former TWA pilots.  The new CBA instead included a side letter agreement called "LOA 12-05" by which American was permitted to close or reduce its St. Louis base at its discretion, and which further provided that any replacement preferential flying rights for the former TWA pilots would be determined by a panel of three arbitrators.

27.     Defendants then appointed the arbitrators to decide the case. The Chairman of the three member panel was Richard Bloch, an arbitrator who had twice ruled against the former TWA pilots on grievances they had previously pursued against American.

28.     The LOA 12-05 arbitrators entered their award in July 2013.  The award reserved to former TWA pilots just 260 Captain positions on American's narrow body aircraft, and 86 Captain positions on its small wide body aircraft.  Supplement CC, on the other hand, had previously reserved up to 1,060 Captain positions to former TWA pilots, allowing the TWA pilots the ability to share and enjoy in the benefits of American's post-bankruptcy growth, an ability they forever lost by the LOA 12-05 award.

29.     In September 2013, American and APA then crafted contract language to implement the LOA 12-05 award, and make it part of the CBA.  They named the document "Supplement C."  A copy of Supplement C is attached hereto as Exhibit 1.

30.     Supplement C's protections are not perpetual.  As to the 260 protected narrow body Captain positions, Supplement C provides they will end when a specific former TWA pilot hired in 1997, Magnus Alehult, has sufficient seniority to be awarded a Captain position on "any aircraft."  *See* Exhibit 1, Section E.4.

31.     When Supplement C was crafted and implemented, American operated three types of aircraft; "Group II" narrow body aircraft (e.g. Boeing 737), "Group III" small wide body aircraft (e.g. Boeing 767), and "Groups IV and V" large wide body aircraft (e.g. Boeing 777). Former TWA pilot Magnus Alehult, because of his placement on the seniority list in 2001, does not have sufficient seniority to hold a Captain position on any of these aircraft types.  Regardless, some American pilots claim the trigger to end Supplement C's narrow body Captain protections has been satisfied

32.     These pilots' claims are based on the fact that Alehult can now hold Captain on the small regional "Group I" aircraft American acquired as part of its merger with US Airways in December 2013 (3 months after Supplement C was implemented).  However, this contingency was anticipated when Supplement C was being crafted, and the Defendants then agreed that US Airways' Group I aircraft would not count against Supplement C.

33.     In correspondence between Defendants' respective attorneys, American stated: "The Company reads the decision [of the arbitrators] as explicitly excluding from the count the Group I CA positions as not being equivalent to a [narrow body] Group II CA."  APA's counsel responded:  "This is consistent with my current understanding."  *See* the July 25, 2013 email exchange between attorney Thomas Reinert for American, and attorney Edgar James for APA, attached as Exhibit 2.

34.     American's attorney later confirmed this understanding in correspondence with American management personnel.  He stated:  "The point of the CA guarantees is to create a number of guaranteed CA positions because otherwise the TW pilots do not have enough system seniority to upgrade.  So, we count any CA **except Group I**."  *See* the August 16, 2013 email exchange between attorney Reinert and others, attached as Exhibit 3, page 2.

35.     Defendants' agreement in this regard was fair and reasonable, as a Group I Captain position is far less desirable than a Group II Captain position.  A Group I Captain earns $158/hour, while a Group II Captain earns $240/hour.  Further the Group I regional aircraft are used for short hauls, with less than 100 passengers.  Pilots generally prefer to fly long hauls with large jets.

36.     APA confirmed the Group I Captain positions should not count for purposes of Supplement C when it subsequently conducted an arbitration to determine how the American and US Airways pilot seniority lists should be integrated.  The evidence at that arbitration was presented by three committees.  The Chairman of APA's American Pilots Committee testified:

> "The Supp C narrowbody protected positions designated and administered under Supp C will not terminate as a direct or unintended consequence of implementing the integrated seniority list. A pilot junior to Alehult bidding a Group I Captain position on any Group I aircraft attributable to the merger will not trigger termination of the narrowbody fence."

*See* the excerpts from the transcript of the October 16, 2015 hearing attached hereto as Exhibit 4, pages 2482-83.

37.     The integrated seniority list crafted by the arbitrators was implemented by American in September 2016.  When American published its next bid in October 2016, Pilot Magnus Alehult was eligible for a Group I Captain position.  This, however, is not a function of

any improvement in his seniority, but merely the fact that Group I Captain positions are undesirable as alleged above.  Those positions are thus taken by the most junior former US Airways pilots who were placed below Alehult on the integrated seniority list.

38.     In light of its agreement, and the intent of Supplement C,   American   thereafter maintained Supplement C's narrow body Captain protections, even though Magnus Alehult had become eligible to hold Captain on the Group I aircraft.

39.     Some legacy American pilots, however, claimed that Magnus Alehult's ability to hold Captain on the Group I aircraft satisfied the condition in Supplement C to end its narrow body Captain protections (*see* para. 30 above), and that the 260 narrow body Captain positions reserved to former TWA pilots should now be awarded based upon seniority.  Among other things, this would cause Plaintiff Horner, and at least 85 other former TWA pilots, to inexplicably be demoted from Captain to First Officer, a $75/hour pay differential.

40.     Three American pilots then filed formal contract grievances that claim American is violating the CBA in not ending Supplement C's narrow body Captain protections for former TWA pilots.   The grievants are First Officers who would stand to upgrade to Captain if they are successful.

41.     A former TWA pilot holding one of Supplement C's protected narrow body Captain positions, Keith Bounds, filed an opposition grievance.

42.     Collectively, these four grievances are referred to as the "the Supplement C grievances."  Copies of these grievances are collectively attached hereto as Exhibit 5.

43.     Although the former TWA pilots were stripped of their seniority in 2001, and more than 1,300 of them were thereafter furloughed; and although in 2012 the former TWA pilots were stripped of the 1,060 Captain protections afforded them by Supplement CC, and

Supplement C's replacement protections reserved only 346 Captain positions to former TWA pilots (among a pilot group of more than 15,000); and although American and APA both previously agreed and represented that the Group I aircraft do not count towards Supplement C; both Defendants now claim they have no position relative to the Supplement C grievances.

44.     Defendants expressly claim they are "neutral" as to how to construe Supplement C, which they alone crafted and to which they agreed.  They instead have now submitted the Supplement C grievances, in the absence of providing meaningful notice or time to respond, to binding arbitration at which Defendants American and APA now state they "will not be advocating a position."  Defendants have thus absurdly left it to pilots adverse to one another to advocate and arbitrate the Defendants' contractual intent.  *See* APA's February 6, 2017 submittal letter attached as Exhibit 6.

44.     Defendants' CBA, like most airline labor contracts, contains extensive dispute resolution procedures.  These procedures are set forth in Sections 21, 22, and 23 of the CBA.  A copy of those Sections of the CBA are attached hereto as Exhibit 7.

45.     Pursuant to CBA Sections 21, 22, and 23, American is required to provide the following process for a pilot contract grievance, such as the Supplement C grievances:

> a.      **"Chief Pilot Initial Grievance Hearing."**  The "Chief Pilot" at a base is the highest ranking management pilot at that base.  The Chief Pilot is required to hear a pilot's grievance within 45 days; if not, the grievance is deemed denied.  If the grievance is denied, the grieving pilot may then proceed to the next step.  *See generally*, Exhibit 7, Section 21.F.

> b.      **"Vice-President Appeal Grievance Hearing."**   A hearing before American's Vice-President-Flight is the second step in the process.   After the hearing, the Vice-President-Flight is required to "provide the specific reasons(s) for the decision, citing factual findings and where applicable any contractual reference or past practice supporting the decision."  If the grievance is denied at this level, it proceeds to the next step.  *See generally*, Exhibit 7, Section 21.G.

> c.      **"Pre-Arbitration Conference."**  A mandatory pre-arbitration conference

is the next step in the process, at which the parties are required to engage in "good faith" settlement discussions.  *See generally*, Exhibit 7, Section 22.

      d.    **"System Board of Adjustment."**  If the case is not settled in the Pre-Arbitration Conference, it is submitted to the System Board of Adjustment.  The System Board is an arbitration panel mandated by the Railway Labor Act, 45 U.S.C. § 151, *et seq*., as the final and binding last step in the grievance process. As to the composition of the System Board, the CBA authorizes either a "Four Member System Board" consisting of two members selected each by American and APA, or a "Five Member System Board" consisting of two members selected each by American and APA, and a "neutral Arbitrator" selected by mutual agreement of American and APA.  *See generally* Exhibit 7, Section 23.

46.    Defendants agreed in the CBA that this 4-step grievance process will generally take up to 2 years to complete, but not more than 28 months.  *See* Exhibit 7, Section 23.D.4. And the first two steps are designed "to assure [a process that] promotes quicker resolution at the lowest grievance level."  *See* Exhibit 7, Section 21.E.1.

47.    Supplement C specifically incorporates these provisions.  It provides that disputes arising under it "will be handled in accordance with the CBA, Sections 21, 22, and 23."  *See* Exhibit 1, Section J.  Despite these requirements, Defendants dispensed with the entire grievance apparatus as to the Supplement C grievances.

48.    On February 6, 2017, Defendants submitted the Supplement C grievances to arbitrator Richard Bloch for his sole determination.  *See* Exhibit 6.  Only four days later, on February 10, 2017, APA gave notice (to its members) that the hearing with Bloch would be expedited, and would begin on March 14, 2017.  *See* February 10, 2017 Arbitration Update attached hereto as Exhibit 8.

49.    Defendants' plan to resolve the Supplement C grievance by way of an expedited arbitration before Bloch as sole arbitrator violates the CBA in several ways:

      A.    APA's February 6 submittal letter states: "The four Individual grievants agreed to waive all preliminary hearings so that the grievances could be submitted directly to the System Board of Adjustment."  *See* Exhibit 3.  This is not true.

The Supplement C grievants only waived their right to a Chief Pilot Initial Grievance Hearing. *See* Exhibit 5. The CBA requires that in such instances, "the grievance will proceed to the Appeal hearing level with the Vice President-Flight." *See* Exhibit 7, Section 21.F.3. The Supplement C grievants cannot and did not waive this requirement. A Vice-President Appeal Hearing is required in all pilot grievances, and American failed to provide one for the Supplement C grievances.

B.     The CBA further requires that "All grievances must be submitted for a [Pre-Arbitration Conference] prior to a hearing by the System Board of Adjustment." *See* Exhibit 7, Section 22.D. The Supplement C grievants cannot and did not waive this requirement, and American failed to provide them the required Pre-Arbitration Conference.

C.     Under the CBA, a System Board hearing can be expedited in only limited circumstances -- on "written request at the time of submission" of the grievance by the Vice-President-Flight, or by APA's President "submitting a Presidential grievance." *See* Exhibit 7, Section 23.D.3. The Supplement C grievances are not "Presidential grievances," they were not submitted to the System Board by the Vice-President-Flight, and there was no request for an expedited hearing when APA submitted them on February 6. There is no contractual basis to expedite the hearing.

D.     APA's Feb. 6 submission of the Supplement C grievances states it "submits these grievances to a one member System Board with Arbitrator Richard Bloch, as agreed by the parties." *See* Exhibit 6. On Plaintiffs' information and belief, there is no such agreement, and even if there was, the CBA and the Railway Labor Act do not authorize a one member supposed "System Board. The CBA calls for either a "Four Member System Board," or a "Five Member System Board." *See generally* Exhibit 7, Section 23. Consistent with this requirement, Defendants, in Supplement C, designated Bloch as "the **neutral member**" of the System Board; they did not designate him as the entire Board. *See* Exhibit 1, Section J. There is no contractual or lawful basis for Defendants to waive the required hearing before a duly constituted System Board as also required by the RLA.

E.     The CBA requires that "All decisions of the Board shall be made by majority vote." *See* Exhibit 7, Section 23.H. A unilateral decision by arbitrator Bloch without a majority vote of the other required members of the System Board would violate this provision, and not be valid.

50.     Defendants' expedited arbitration of the Supplement C grievances also violates a protocol for resolving such disputes established by the System Board that determined the seniority integration of the American and US Airways pilots in September 2016:

A.     The "System Board of Adjustment For Disputes Related to the American Airlines-US Airways Seniority Integration" established a protocol for the resolution of disputes arising out of the seniority integration.  A copy of this Protocol is attached hereto as Exhibit 9.

B.     The issue raised in the Supplement C grievances is the subject of several claims submitted for resolution pursuant to the protocol established by the Seniority Integration System Board, including a claim made by Plaintiff Hartman. Those claims are pending before Arbitrator Eischen.

C.     American challenged Arbitrator Eischen's jurisdiction to decide the issue, arguing this was a matter to be decided as a grievance under the CBA.  Under the protocol, if Arbitrator Eischen determines he has jurisdiction "to address the claim, that decision shall be final and binding, and shall **bar the claim from being processed as a grievance under the CBA**." *See* Exhibit 9, p. 5.

D.     Arbitrator Eischen has not yet decided his jurisdiction to resolve the claims submitted to him, and if he decides he has jurisdiction, Defendants would be barred from processing the Supplement C grievances.  The submission of the Supplement C grievances to Arbitrator Bloch for expedited resolution thus violates the protocol established by Defendants' System Board of Adjustment For Disputes Related to the American Airlines-US Airways Seniority Integration.

51.     In light of the foregoing, Plaintiffs filed grievances March 6, 2017 which protest Defendants' processing of the Supplement C grievances in violation of the CBA.   Copies of Plaintiffs' grievances are attached as Exhibit 10.   Plaintiffs' grievances, however, will not even receive the required Chief Pilot Initial Hearing before Bloch holds his hearing March 14 to resolve the merits of the Supplement C grievances.

52.     Thus, unless Defendants are enjoined from carrying out their unlawful arbitration, the whole issue could very well be a *fait accompli* before Plaintiffs' legitimate and substantial complaints about the Supplement C grievance process are determined.

53.     If Arbitrator Bloch is allowed to proceed, and decides the Supplement C grievances against the former TWA pilots, Plaintiffs and nearly all of the other 900-plus former TWA pilots will suffer substantial and irreparable harm:

A.      Plaintiff Horner, and at least 85 other former TWA Captains, will be demoted to First Officer. The loss in pay from the demotion will be significant: $240/hour vs. $165/hour. In addition, most of these pilots will suffer substantial degradation to their working conditions and quality of life, as they will be forced to sit on reserve outside their current home base.  Reserve positions are guaranteed 15 fewer hours per month than "line" positions, and unless the pilot is on reserve at his or her home base, the time sitting on reserve (as much as six days) is typically done from an apartment or so-called "flop house."

B.      There are 150-plus pilots currently in protected Captain positions that will likely not be demoted, including Plaintiff Hartmann.  These pilots, however, will also be forced to reserve positions outside their home base, and suffer the same degradations of reserve pay and working conditions.

C.      Many of the 650-plus former TWA First Officers, including Plaintiff Krakowski, will also be forced to reserve positions outside their home base.  Further, their paths to Captain will be yet again extended beyond that of any other American pilot.

54.     Plaintiffs are likely to succeed on the merits of their claims protesting Defendants' processing of the Supplement C grievances in that Defendants' blatantly and substantially violated their CBA's grievance procedures in submitting the Supplement C grievances to an expedited arbitration with one arbitrator they selected and refusing to testify at that arbitration concerning their contractual intent regarding Supplement C.

55.     Defendants will not be harmed if an injunction is entered.

56.     Plaintiffs have no adequate legal remedy.

57.     The public's interest in the lawful performance of labor contracts favors the requested injunction.

**WHEREFORE,** Plaintiffs request the Court enter a Temporary Restraining Order and Preliminary Injunction barring Defendants from conducting the Supplement C grievance hearing before Arbitrator Bloch that is scheduled to begin March 14, 2017, until such time as Plaintiffs' grievances regarding that process are finally determined in a manner consistent with the provisions of the CBA, and for such other relief as the Court deems proper.


[INTENTIONALL LEFT BLANK]

Respectfully submitted,

**COLE SCHOTZ P.C.**

By:/s/ James W. Walker
James W. Walker (Lead Attorney)
(TX Bar No. 20709600)
Email: jwalker@coleschotz.com
2515 McKinney Ave., Suite 1350
Dallas, TX 75201
Telephone: (469) 557-9390
Facsimile: (469) 553-0361



Allen P. Press (Attorney to be Noticed)
(Missouri Bar # 39293)
E-mail: press@ArchCityLawyers.com
JACOBSON PRESS & FIELDS P.C.
168 North Meramec Ave., Suite 150
Clayton, MO 63105
Phone: (314) 899-9789
Facsimile: (314) 899-0282
*Application for Admission to Northern District Pending*

**ATTORNEYS FOR PLAINTIFFS**