IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KEVIN HORNER, et al.,           §
                                §
              Plaintiffs,        §
                                §
VS.                             §        Civil Action No. 3:17-CV-0665-D
                                §
AMERICAN AIRLINES, INC., et al., §
                                §
              Defendants.        §

MEMORANDUM OPINION
AND ORDER

Four pilots employed by defendant American Airlines, Inc. ("American") and represented by the Allied Pilots Association ("APA") bring this action seeking to vacate an arbitration award and a preliminary injunction enjoining implementation of the award. American and APA move to dismiss, APA moves in the alternative for summary judgment, and plaintiffs move for partial summary judgment. For the reasons explained, the court grants American's and APA's motions to dismiss, grants APA's motion for partial summary judgment, denies plaintiffs' motions for partial summary judgment and for a preliminary injunction, and dismisses this action by judgment filed today.

I

This case is the latest chapter in a multi-year dispute over the integration of former Trans World Airlines ("TWA") pilots into the American pilot seniority list. In 2001 American merged with TWA. Following the merger, American and APA negotiated the

integration of TWA pilots into the American pilot seniority list.[1]  Plaintiffs Kevin Horner

("Horner"), John Krakowski ("Krakowski"), Keith Bounds ("Bounds"), and Joseph Tersteeg

("Tersteeg") (sometimes referred to collectively as "the former TWA pilots") were employed

as pilots by TWA before the American-TWA merger, and by American after the merger.

The pilot-integration agreement, known as Supplement CC, was an addendum to the

then-operative APA/American collective bargaining agreement.   Under the integrated

seniority list, the majority of former TWA pilots were not fully accredited for the seniority

they accrued at TWA.  Supplement CC, however, created a "protective fence" in St. Louis

that reserved a minimum number of Captain and First Officer positions for the former TWA

pilots that otherwise would not have been available to them under the integrated seniority list.

American and APA historically submitted grievances filed by former TWA pilots regarding

Supplement CC to a single neutral arbitrator.

The Supplement CC protections continued to be observed until American filed for

bankruptcy in 2011.  With bankruptcy court permission, American rejected the collective

bargaining agreement between American and APA.  This rejection abrogated Supplement

CC as well.

APA and American agreed to a new collective bargaining agreement ("CBA") in

2012.  Under a provision of the new CBA known as Letter of Agreement 12-05 ("LOA 12-

---

[1]Pilot seniority determines many aspects of their professional lives.  For example, seniority dictates a pilot's rank, schedule, type of aircraft flown, and ability to prevail in bid awards.  Each of these factors impacts a pilot's pay and quality of life.

05"), the parties agreed to "engage in final and binding interest arbitration" pursuant to § 7 of the Railway Labor Act ("RLA") to determine what preferential flying rights the former TWA pilots would receive to replace the protections formerly provided by Supplement CC. The parties arranged for a panel of three neutral arbitrators, "with Richard Bloch as the principal neutral." Ps. App. 73; APA App. 43. LOA 12-05 specified that, following the panel's decision, "Richard Bloch shall have continuing jurisdiction to resolve disputes over the implementation and interpretation of the decision by the panel." *Id.* After the LOA 12-05 arbitration panel made its decision, APA and American translated the ruling into contractual language to supplement the CBA. The panel approved this language, known as Supplement C, in 2013.

Supplement C's protections reserve Captain positions on 260 narrow-body aircraft and 86 small wide-body aircraft for former TWA pilots. These protections, however, are not perpetual. Each is subject to conditional events that trigger their expiration. Supplement C provides that the 260 narrow-body Captain positions will no longer be reserved for former TWA pilots when a particular former TWA pilot—Magnus Alehult ("Alehult")—has sufficient seniority to bid for a Captain position "on any aircraft." Ps. App. 28.

Supplement C also contains dispute resolution procedures. It provides that, after Supplement C's approval, all disputes

> will be handled in accordance with the CBA, Sections 21, 22, and 23. If available, Richard Bloch shall sit as the neutral member of the System Board for disputes arising under this Supplement. If Richard Bloch is unable or unwilling to serve, the parties will select the first available date from either Stephen

Goldberg or Ira Jaffe, the other two members of the LOA 12-05 Interest Arbitration Panel. In the event that neither of them is willing or able to serve, the arbitrator selection procedures of Section 23 of the CBA will be utilized to select an arbitrator.

Ps. App. 30.

As referenced in Supplement C, Sections 21, 22, and 23 of the CBA establish American and APA's grievance procedures. They provide that a grievant is entitled to an initial hearing with his base's Chief Pilot, then an appeal hearing with American's Vice President-Flight. A grievant may chose to submit a grievance directly to the appeal hearing. When these procedures are exhausted, the President of APA may choose to pursue a grievance in a binding arbitration before a System Board of Adjustment ("System Board"). A grievance proceeds to the System Board following a Pre-Arbitration Conference ("PAC"). Section 23 specifies that, for contract interpretation disputes, "[t]he System Board of Adjustment may be constituted as either a Four Member Board or a Five Member Board." Ps. App. 52. A four member board consists of two members selected by the President of APA and two members selected by American. A five member board adds a neutral arbitrator as the fifth member.

In 2013 American merged with US Airways. When American and APA first implemented Supplement C, American operated four different aircraft groups: Group II, Group III, Group IV, and Group V. Through the US Airways merger, however, American acquired a fleet of smaller planes called Group I aircraft. Group I Captains are paid at a lower rate than Captains of aircraft in Groups II through V. In 2016, when US Airways

pilots were fully integrated into the American seniority list, Alehult had sufficient seniority to bid for a Captain position on the new Group I Aircraft. American maintained, however, that the phrase "any aircraft" in Supplement C did not include Group I aircraft. APA officials also stated that Group I Captain positions should not count for purposes of Supplement C. Therefore, American continued to observe Supplement C's protections for former TWA pilots.

Thereafter, three legacy American pilots filed grievances against American, contending that, because Alehult was eligible to bid for a Group I Captain position, Supplement C's narrow body protections had expired. Each legacy American pilot waived his right to an initial hearing. Bounds filed an opposition grievance, contending that the Supplement C protections were still in place. Bounds requested that his grievance be consolidated with those of the legacy American pilots (collectively, the "Supplement C grievances") and be "given 'equal footing' in all hearings and arbitrations scheduled and conducted." Ps. App. 41. In correspondence with APA, Bounds also asked "to waive the initial [hearing], appeal and PAC and proceed directly to the system board" arbitration. APA App. 6.

American and APA agreed to advance the grievances directly to a single-member System Board with Richard Bloch ("Arbitrator Bloch") as the sole neutral arbitrator. The remaining Supplement C grievants waived all pre-arbitration steps in the CBA grievance process, and APA formally submitted the Supplement C grievances to the single-member System Board. Although American and APA both decided to remain neutral regarding the

Supplement C grievances, APA provided each group of grievants $74,000 to retain its choice of counsel and prepare its cases.

Bounds filed a motion to dismiss with Arbitrator Bloch, arguing that he did not have jurisdiction to hear the dispute under the single-member System Board format. Arbitrator Bloch denied the motion, finding that Supplement C provided him jurisdiction. Separately, Horner, Krakowski, and Charles Hartman (another former TWA pilot now employed by American) sued APA and American in this court, seeking a temporary restraining order to stay the Supplement C arbitration proceedings so that they could complete a separate arbitration of seniority integration grievances. After the court denied the motion,[2] Arbitrator Bloch held a hearing on the Supplement C grievances.

Following a two-day hearing, Arbitrator Bloch ruled in favor of the legacy American pilots, finding that the Supplement C narrow body protections should have expired when Alehult became eligible for a Group I Captain position. He remanded the dispute to APA and American to fashion an appropriate remedy. In his ruling, Arbitrator Bloch again affirmed his jurisdiction.

Horner, Krakowski, and Bounds later filed a second amended complaint against APA

---

[2]After the court denied the motion for a temporary restraining order, Bounds joined Horner and Krakowsi as plaintiffs in filing an amended complaint. Plaintiffs later dismissed their claims against APA without prejudice, while American moved to dismiss. Following the conclusion of the Supplement C grievances, plaintiffs moved for leave to file a second amended complaint, and the court granted the motion.

and American.[3]  They seek to vacate Arbitrator Bloch's award, contending that Arbitrator Bloch lacked jurisdiction because the modified grievance and arbitration process violated the RLA and the CBA and because the Supplement C grievances did not qualify as an arbitrable dispute.  Plaintiffs also assert that APA breached its duty of fair representation by allowing these modifications to the grievance and arbitration process, in addition to refusing to honor a prior agreement that Group I aircraft would not count against Supplement C's protections.[4] Plaintiffs request that the court vacate Arbitrator Bloch's award, "order Defendants to process the Supplement C grievances as required by the RLA and the CBA," and award costs and attorney's fees.  2d Am. Compl. 18.

Plaintiffs now move for partial summary judgment on count 1 of the second amended complaint, seeking vacatur of Arbitrator Bloch's award based on his lack of jurisdiction, and a preliminary injunction to enjoin American from implementing the award.  APA moves to dismiss under Fed. R. Civ. P. 12(b)(1) and Rule 12(b)(6), or, in the alternative, for summary judgment, and American also moves to dismiss.  APA and America both contend that plaintiffs lack standing to contest the results of the arbitration and that no aspect of the

_____

[3]Tersteeg filed a complaint in intervention and was added as a plaintiff.

[4]The second amended complaint pleads that "APA has a duty to Plaintiffs to fairly represent them," but does not allege that American had any such duty.  2d Am. Compl. 17-18.  Plaintiffs only assert that "American knowingly participated in APA's breaches as alleged."  *Id.* at 17.  Therefore, to the extent that plaintiffs intend to assert against American a claim for breach of the duty of fair representation, it fails for the same reasons it fails against APA.

Supplement C grievances' resolution violated the RLA or the CBA.[5]

## II

APA and American move to dismiss under Rule 12(b)(1).  They maintain that, because the CBA gives exclusive authority to APA to advance a grievance to the arbitration stage, plaintiffs lack standing under the RLA to contest Arbitrator Bloch's award in court.[6]

## A

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims."  *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998).  A Rule 12(b)(1) motion can mount either a facial or factual challenge.  *See, e.g., Hunter v. Branch Banking & Tr. Co.*, 2013 WL 607151, at *2 (N.D. Tex. Feb. 19, 2013) (Fitzwater, C.J.) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. May 1981)).  When a party makes a Rule 12(b)(1) motion without including evidence, the challenge to subject matter jurisdiction is facial.  *Id.*  The court assesses a facial challenge as it does a Rule 12(b)(6) motion in that it "looks only at the sufficiency of the allegations in the pleading and assumes them to be true.  *Id.*  If the allegations are sufficient to allege

---

[5]On December 1, 2017 plaintiffs filed a motion for leave to file supplemental memorandum in support of their motion for preliminary injunction.  Because the proposed supplemental memorandum does not impact the basis on which the court is denying plaintiffs' motion for a preliminary injunction, the court denies the motion for leave.

[6]APA also contends that plaintiffs have failed to plead Article III standing because they lack an alleged injury in fact that would likely be redressable by a favorable decision.  Because the court holds that plaintiffs lack standing, it need not address APA and American's Article III standing argument.

jurisdiction, the court must deny the motion." *Id.* (additional citation omitted) (citing *Paterson*, 644 F.2d at 523). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam) (citations omitted).

B

The court first turns to whether plaintiffs have standing under the RLA.

1

An individual "'aggrieved employee will generally lack standing to bring an RLA action.'" *Mackenzie v. Air Line Pilots Ass'n, Int'l*, 598 Fed. Appx. 223, 226 (5th Cir. 2014) (per curiam) (quoting *Mitchell v. Cont'l Airlines, Inc.*, 481 F.3d 225, 233 n.24 (5th Cir. 2007)).

> [W]hen a CBA formed pursuant to the RLA establishes a mandatory, binding grievance procedure and vests the union with the exclusive right to pursue claims on behalf of aggrieved employees, an aggrieved employee whose employment is governed by the CBA lacks standing to attack the results of the process in court—the sole exception being the authorization of an aggrieved employee to bring an unfair representation claim.

*Mitchell*, 481 F.3d at 233. Because this standing rule is "necessary to effectuate the purposes behind federal labor statutes, which require that the interests of particular individuals be subordinated to the interests of the group at the contract-negotiation stage and beyond," *Id.* at 232, courts have applied it to multiple collective bargaining statutes. *See, e.g., McNair*

- 9 -

*v. U.S. Postal Serv.*, 768 F.2d 730, 735 (5th Cir. 1985) (applying standing rule to arbitrations under Labor Management Relations Act); *Acuff v. United Papermakers & Paperworkers*, 404 F.2d 169, 171 (5th Cir. 1969) (applying standing rule to arbitrations under National Labor Relations Act).

At the same time, 45 U.S.C. 153 First (q) may provide standing to individual employees who pursue arbitration for "uniquely individual claims."[7] *Mitchell*, 481 F.3d at 233 n.24 (citing *McQuestion v. N.J. Transit Rail Operations*, 892 F.2d 352, 354055 (3d Cir. 1990)); *Mackenzie*, 598 Fed. Appx. at 226 n.4 (same). Claims are not uniquely individual, however, where the employee's union pursued the arbitration in question on behalf of all its members. *Mackenzie*, 598 Fed. Appx. at 226 n.4 (citing *Mitchell*, 481 F.3d at 233 n.24).

2

APA and American contend that plaintiffs lack standing under the RLA. They point out that only Bounds was a Supplement C grievant before Arbitrator Bloch, and that no other plaintiff took part in the arbitration. APA and American maintain that not even Bounds has standing to challenge the award because the current CBA establishes a mandatory grievance

---

[7]45 U.S.C. 153 First (q) provides:

> [i]f any employee or group of employees, or any carrier, is aggrieved by the failure of any division of the Adjustment Board to make an award in a dispute referred to it, or is aggrieved by any of the terms of an award or by the failure of the division to include certain terms in such award, then such employee or group of employees or carrier may file in any United States district court.

procedure and gives APA the exclusive ability to advance a grievance to the System Board for binding arbitration. APA and American acknowledge that, under the CBA, individual pilots have the right to file and advocate grievances through all but the arbitration phase of the grievance process. Nevertheless, they posit that, because only the President of APA may advance a grievance to the System Board, where the arbitration itself occurs, *Mitchell* and *Mackenzie* still apply here. Moreover, APA and American contend that 45 U.S.C. § 153 First (q) does not confer standing either. Thus they posit that plaintiffs are barred from directly contesting Arbitrator Bloch's award outside of a claim for breach of the duty of fair representation.

Plaintiffs contend that they have standing to contest the award directly and that *Mitchell* and *Mackenzie* are inapposite. Horner and his fellow former TWA pilots contend that, under the CBA, individual pilots can pursue grievances through the mandatory grievance process. They posit that this gives individual pilots "the right to pursue claims," in contradiction with *Mitchell* and *Mackenzie*, which require that the union have exclusive control. Plaintiffs maintain that APA's exclusive right to advance a grievance to arbitration is not dispositive. They contend that, because the pilots themselves advocated before Arbitrator Bloch, they have standing to challenge his ruling. Alternatively, plaintiffs contend that the plain language of the RLA, 45 U.S.C. § 153 First (q), also confers standing on them to contest Arbitrator Bloch's award. In sum, plaintiffs maintain that they have standing to challenge the results of the arbitration outside of a claim for breach of the duty of fair

representation.

The court holds that the *Mitchell* rule applies where, as here, the union has the sole authority to compel the binding arbitration of a grievance under a CBA formed pursuant to the RLA. Although *Mitchell* and *Mackenzie* are the only Fifth Circuit cases that apply this limitation on standing, their reasoning illustrates that the union's exclusive control over advancing individual claims to arbitration is sufficient to trigger the rule. The *Mitchell* panel explained that limiting an individual employee's standing advances the purposes of federal labor statutes. "If an employee could compel arbitration of a grievance without his union's blessings, a CBA's contractual conflict-resolution procedures would be substantially undermined[.]" *Mitchell*, 481 F.3d at 232. The ability of an individual employee "to seek judicial review of an arbitral award [] after being abandoned by his union" could therefore "'destroy[] the employer's confidence in the union's authority and return[] the individual grievant to the vagaries of independent and unsystematic negotiation.'" *Id.* at 232-33 (quoting *Vaca v. Sipes*, 386 U.S. 171, 191 (1967)).

Under the current CBA between American and APA, a pilot "may protest the Company's action(s) by filing a grievance" and pursue that grievance through the first stages of the CBA's grievance process. Ps. Reply Br. 3. After the appeal hearing before the Vice President-Flight, however, the agency of the individual grievant ends. Only the President of the APA can elect to advance the grievance to binding arbitration on behalf of the aggrieved employees. That APA chose to allow multiple grievances to be consolidated and

heard together does not alter the fact that it was solely at APA's discretion that these grievances were arbitrated, and, pursuant to the CBA, allowed to bind the union as a whole. In allowing the grievances to move forward, the APA exercised its exclusive authority to pursue these grievances in arbitration.

Plaintiffs contend that, because APA did not advocate for a claim in this case, APA "pursued" no claim and *Mitchell* cannot apply. APA in fact took no position on the Supplement C grievances and allowed the pilots to advocate for themselves before the System Board. But this alone does not confer standing. Even in *Mitchell* the individual employees represented themselves when presenting their grievance to the arbitrator after their union "informed them it would not be representing them[.]" *Mitchell*, 481 F.3d at 229. The key factor in *Mitchell* and *Mackenzie*, therefore, is not who advocated before the arbitrator, but who was given the authority to advance the claims to the binding arbitration stage. Because APA had that exclusive authority here, plaintiffs do not have standing to challenge the result of the arbitration.

Nor do the cited textual provisions of the RLA provide plaintiffs with standing. As explained above, 45 U.S.C. § 153 First (q) only provides an individual employee standing when he is pursuing arbitration for "uniquely individual claims." While the parameters of this phrase have not been fully established, the Supplement C grievances fall outside its known bounds. These grievances were being arbitrated, not solely for the benefit of plaintiffs, but for the hundreds of American pilots affected by the Supplement C protections.

*Cf. McQuestion*, 892 F.2d at 353-54 (holding claim of two plaintiffs was uniquely individual when arbitration examined solely plaintiffs' dismissal). Because the result of the arbitration binds the entire union, the claims cannot be said to be uniquely individual to plaintiffs.

For the foregoing reasons, the court holds that the former TWA pilots do not have standing to challenge Arbitrator Bloch's award under the RLA. The court therefore grants APA and American's motion to dismiss count 1 under Rule 12(b)(1) and denies the former TWA pilots' motion for partial summary judgment on count 1.

III

APA moves to dismiss, or, in the alternative, for summary judgment dismissing plaintiffs' remaining claim for the breach of the duty of fair representation.[8]

A

Although APA seeks summary judgment in the alternative, the court will treat the motion as on for summary judgment because the court is considering evidence outside the pleadings. *See* Rule 12(d). The court need not give formal notice of the conversion since APA has moved for summary judgment in the alternative. *See Al-Juburi v. Chertoff*, 2007 WL 2285964, at *4 (N.D. Tex. Aug. 9, 2007) (Fitzwater, J.) ("[A] motion styled as an alternative summary judgment motion generally provides sufficient notice of conversion and makes formal notice of conversion unnecessary."); *see also Porter v. Shearson Lehman Bros. Inc.*, 802 F. Supp. 41, 52-53 (S.D. Tex. 1992) ("[Plaintiff] was on notice . . . [because

_____

[8]In addressing this claim, the court assumes *arguendo* that plaintiffs have asserted a redressable injury in fact, as required for Article III standing.

defendant] framed its motion as one to dismiss for failure to state a claim and for summary judgment.").

B

Because APA will not have the burden of proof at trial on plaintiffs' claim, APA need only point the court to the absence of evidence of any essential element of that claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once it does so, plaintiffs must go beyond their pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in plaintiffs' favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Plaintiffs' failure to produce proof as to any essential element of the claim renders all other facts immaterial. *TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory where plaintiffs fail to meet this burden. *Little*, 37 F.3d at 1076.

C

A claim for the breach of the duty of fair representation is an exception to the general rule that an employee is bound by the final result of a CBA's dispute resolution system. *See Mitchell*, 481 F.3d at 233. To succeed on a such claim, an employee must show that the union's conduct "was arbitrary, discriminatory, or in bad faith, so that it undermined the fairness or integrity of the grievance process." *Jaubert v. Ohmstede, Ltd.*, 574 Fed. Appx. 498, 501 (5th Cir. 2014) (per curiam) (quoting *Landry v. The Cooper/T. Smith Stevedoring*

- 15 -

*Co.*, 880 F.2d 846, 852 (5th Cir. 1989)).  "Any substantive examination of a union's performance [] must be highly deferential[.]"  *Airline Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991).  A union must be allowed "'certain latitude in resolving how the investigation and processing of a grievance is to be conducted.'"  *Jaubert*, 574 Fed. Appx. at 501 (quoting *Hart v. Nat'l Homes Corp.*, 668 F.2d 791, 794 (5th Cir. 1982)).  And "[e]ven if a member shows that his union breached its duty, he must also show that the breach contributed to the erroneous outcome of the . . . proceedings."  *Carr v. Airline Pilots Ass'n, Int'l*, 866 F.3d 597, 602 (5th Cir. 2017) (internal quotation marks and citation omitted).

Union behavior must meet different standards to qualify as either arbitrary, discriminatory, or in bad faith.  "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational."  *O'Neill*, 499 U.S. at 67 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)).  "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong."  *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45-46 (1998).  "A union does not breach its duty of fair representation . . . through simple negligence or a mistake in judgment."  *Warner v. Lear Corp.*, 2016 WL 339606, at *3 (N.D. Tex. Jan. 28, 2016) (Fitzwater, J.) (citing *Landry*, 880 F.2d at 852; *Vaca*, 386 U.S. at 192-93); *see also Connally v. Transcon. Lines,* 583 F.2d 199, 203 (5th Cir. 1978) (finding no breach although union "may have been somewhat negligent in its handling of the

grievances"). A union's acts are discriminatory when "substantial evidence" indicates that it engaged in discrimination that was "intentional, severe, and unrelated to legitimate union objectives." *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp.'s of Am. v. Lockridge*, 403 U.S. 274, 301 (1971). "Bad faith occurs when a union acts with a 'motive to harm' a particular group, and turns on the subjective motivation of the union officials." *Carr*, 866 F.3d at 602 (quoting *O'Neill v. Airline Pilots Ass'n, Int'l*, 939 F.2d 1199, 1203 (5th Cir. 1991)). This is a "demanding standard" satisfied "only by 'sufficiently egregious' union action" that indicates a purpose to intentionally harm the membership. *Id.* (internal citations omitted); *see also McCall v. Sw. Airlines Co.*, 661 F.Supp.2d 647, 654 (N.D. Tex. 2009) (Lynn, J.) (quoting *Freeman v. O'Neal Steel, Inc.*, 609 F.2d 1123, 1128 n.9 (5th Cir. 1980)) ("Bad faith conduct has also been described by the Fifth Circuit as 'the absence of honest purpose and judgment or the presence of hostility or discrimination' by the union.").

In the grievance context, "[a]n employee has no absolute right to have his grievance taken to arbitration or to any other level of the grievance process." *Landry*, 880 F.2d at 852 (citing *Vaca*, 386 U.S. at 191; *Turner v. Air Transp. Dispatchers Ass'n*, 468 F.2d 297, 300 (5th Cir. 1972)). Under the standard, however, "a union may not arbitrarily ignore a meritorious grievance or process it in [a] perfunctory fashion." *Landry*, 880 F.2d at 852 (citation and internal quotation marks omitted). Thus "the duty of fair representation imposes an obligation for a union to investigate a grievance in good faith" and "prosecute a grievance with reasonable diligence unless it decided in good faith that the grievance

lacked merit or for some other reason should not be pursued." *Id.*; *accord Warner*, 2016 WL 339606, at *3.

D

Plaintiffs maintain that APA breached its duty of fair representation on several grounds related to the resolution of the Supplement C grievances. They allege that all of these actions were arbitrary, reflect APA's "long-held institutional hostility to former TWA pilots," and consequently "seriously undermined the Supplement C grievance process." 2d Am. Compl. 17-18. For clarity, the court will group the factual allegations and address each below.

1

Plaintiffs allege that APA's failure to "enforce its prior agreement and stated intent that US Airways' Group I aircraft would not count against Supplement C's narrow body Captain protections" was both arbitrary and hostile. 2d Am. Compl. 17. They assert that before the Supplement C grievances, both APA and American agreed that the Group I Captain positions should not be considered "any aircraft" under Supplement C. Plaintiffs note that "had [APA] simply honored its agreement, there would have been no arbitration with Bloch." Ps. Reply Br. 24. According to plaintiffs, APA instead advanced the Supplement C grievances to arbitration "in a manner that pitted pilot (Plaintiff Bounds) versus pilots (three legacy American pilots)." 2d. Am. Compl. 17. They allege that this choice to allow arbitration and remain neutral throughout the arbitration process is due to the

new APA President's hostility toward former TWA pilots. Plaintiffs posit that the grievance process was irredeemably undermined as a result.

APA responds that its choice to advance the grievances to arbitration did not breach of the duty of fair representation. It contends that, as the union for both the legacy American and former TWA pilot groups, the APA is required to balance the interests of all members. As a result, the APA chose to allow both the legacy American grievants and Bounds to present their respective sides before a neutral arbitrator: the same neutral arbitrator who crafted the award that led to the contested contract language.

The court holds that plaintiffs have failed to adduce evidence that would enable a reasonable jury to find that APA's conduct was arbitrary, discriminatory, or in bad faith. The Supplement C grievances involve an issue of seniority integration. Numerous circuits have acknowledged that pilot seniority systems create a zero-sum game, where advancing the interests of one group of pilots can only be to the detriment of another. *See Addington v. US Airline Pilots Ass'n*, 791 F.3d 967, 980 (9th Cir. 2015) ("And the issue of seniority . . . is the equivalent of a family feud over an inheritance: it is a zero-sum game, where moving one pilot up the list necessarily requires moving another pilot down"); *Airline Pilots Ass'n v. Dep't of Transp.*, 880 F.2d 491, 496-97 (D.C. Cir. 1989) (same). Given this reality, multiple courts have found that unions may refer such disputes to the collective bargaining agreement arbitration process without breaching the duty of fair representation. *See Bakos v. Am. Airlines, Inc.*, 2017 WL 2772705, at *6 (E.D. Pa. June 26, 2017), *appeal docketed*,

No. 17-2505 (3d Cir. July 14, 2017); *Gvozdenovic v. United Airlines, Inc.*, 933 F.2d 1100, 1107 (2d Cir. 1991). Although this case does not involve the formation of a seniority list itself, a reasonable jury could only find that this dispute over Supplement C's terms carries the same zero-sum consequences for APA's membership.

Within this context, plaintiffs have adduced no evidence that would enable a reasonable jury to find that APA's neutrality through the grievance process was arbitrary. Plaintiffs contend that APA's neutrality amounts to abandoning the "agreement" it had with American regarding the Supplement C provisions. In support, they cite cases finding a breach of the duty of fair representation where the union violated contractual obligations. For example, in *Lewis v. Tuscan Dairy Farm*, 829 F. Supp. 665 (S.D.N.Y. 1993) *aff'd in part, vacated in part*, 25 F.3d 1138 (2d Cir. 1994), the court held that union leaders are not free to disregard contracts "whenever it seems reasonable to the union leadership." Here, however, plaintiffs assert no facts that indicate there was a legally enforceable contract regarding the interpretation of "any aircraft" in Supplement C. At most, a reasonable jury could find that APA and American at one time interpreted the Supplement C language the same way.

Plaintiffs are correct that APA officials previously stated that "any aircraft" did not include Group I aircraft. But even if this was once APA's official position, it does not preclude APA from shifting to a neutral position. *See, e.g., Schultz v. Owens-Ill. Inc.*, 696 F.2d 505, 515-16 (7th Cir. 1982) (concluding there was no breach of duty of fair

representation when union changed interpretation of collective bargaining agreement provision after balancing interests of union members); *Carr*, 866 F.3d at 601 ("The fact that a union decided a dispute in a way that favored one group's interest over another is not sufficient to show a breach of that duty [of fair representation]."). A union's official policy "is the result of evolution, of experimentation and change when the circumstances warrant." *Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524, 1533 (7th Cir. 1992). Here, given its membership's contentious split over Supplement C's protections, a reasonable jury could only find that APA concluded that the circumstances warranted neutrality.[9] Accordingly, it provided both camps with funding to hire counsel of their choice and prepare the presentation of evidence before a neutral arbitrator. This ensured that both "employee groups had been vigorously represented throughout the proceedings." *Cook v. Pan Am. World Airways*, *Inc.*, 771 F.2d 635, 645 (2d Cir. 1985), *abrogated on other grounds*, *Lorance v. AT & T Techs.*, 490 U.S. 900 (1989). Thus when "faced with two group of its members with objectives that were directly at odds. . . . [submitting] the impending dispute to arbitration was an equitable and reasonable method of resolving it." *Gvozdenovic*, 933 F.2d at 1107. Given the wide latitude courts afford unions in this context, plaintiffs have failed to point to facts that create a genuine question of fact that APA's conduct was arbitrary.

---

[9]Plaintiffs' claim that the CBA prohibits APA's position of neutrality is unavailing. That the union must report its position to the System Board under the CBA does not limit the possible positions to "pro" or "con." Indeed, plaintiffs cite no authority that would prevent APA from informing the arbitrator that it was taking a neutral position, which it did here.

Moreover, no reasonable jury could find that APA's conduct was either discriminatory or in bad faith. Plaintiffs contend that the new APA President's "hostility for former TWA pilots as a group" motivated the union's conduct. But in support this alleged hostility, they assert no facts beyond APA's handling of the Supplement C grievances. This is insufficient. The foregoing analysis demonstrates that maintaining neutrality and providing two groups of employees the same resources to pursue arbitration could only be found to be reasonable. And because the two groups were provided equal opportunity to assert their cases, the procedure cannot be deemed discriminatory. *See Bowerman v. Int'l Union*, 646 F.3d 360, 368-70 (6th Cir. 2011) (holding there was no evidence of discrimination when contested training opportunities were available to plaintiffs and other groups); *Buford v. Runyon*, 160 F.3d 1199, 1202 (8th Cir. 1998) (holding there was no breach of duty of fair representation when two employees' cases were similarly treated but received different outcomes). Similarly, plaintiffs do not assert facts that would support a reasonable finding of the "substantially egregious" conduct required to infer that APA's neutrality was motived by a desire to harm the APA's membership. *See, e.g., Thompson v. United Transp. Union*, 588 F.3d 568, 572 (8th Cir. 2009) (requiring finding of fraud, deceitful action, or dishonest conduct to hold that union acted in bad faith); *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 917 (7th Cir. 2013) (requiring "facts that suggest a motive for the union's alleged failure"). Without additional evidence of deceitful, malicious, or improper acts, a reasonable jury could not find that APA's neutrality and submission of

grievances breached the duty of fair representation.

Plaintiffs also allege that APA "[r]efus[ed] to provide the Supplement C grievants, including Plaintiff Bounds, access to the grievance process set forth in the CBA and required by the RLA." 2d. Am. Compl. 17. They maintain that advancing Bounds's grievance directly to the System Board arbitration and omitting the pre-arbitrations steps violated both the CBA and the RLA. Plaintiffs posit that, not only are these steps mandatory under the RLA, but the CBA also offers no provision that would allow a grievant to waive these parts of the dispute resolution process. They reason that, because Bounds was not afforded the required procedures, APA breached the duty of fair representation.

APA responds that, rather than "refusing" to submit Supplement C grievances to the pre-arbitration steps, it allowed Bounds and the other Supplement C grievants to voluntarily waive them. It maintains that doing this allowed all of the Supplement C grievances to be consolidated, because the earlier filed grievances were ready to be submitted to arbitration. In this way, Arbitrator Bloch heard from both the former TWA pilots and the legacy American pilots simultaneously. APA therefore posits that its actions were not arbitrary, discriminatory, or in bad faith.

The CBA itself only explicitly addresses a grievant's ability to waive his initial hearing and appeal directly to the Vice President-Flight. It is otherwise silent on waiver. If the Vice President-Flight appeal hearing is not scheduled within 45 days, "it shall be

deemed to be denied and the President of the [APA] shall have the right to proceed to" the PAC and arbitration before the System Board. Ps. App. 47.

All four of the Supplement C grievants, APA, and American agreed, however, to waive the latter steps of the CBA pre-arbitration procedures. The legacy American pilots and Bounds all initially sought to waive the initial hearing and proceed directly to the Vice President-Flight's appeal hearing. Each later agreed to waive the additional pre-arbitration steps. Bounds specifically informed APA that he "wish[ed] to waive the initial [hearing], appeal and PAC, and proceed directly to the system board" in order to be consolidated with the earlier filed Supplement C grievances.[10] APA App. 6. Therefore, the relevant questions are, first, whether a union breaches the duty for fair representation when it allows a grievant to join additional grievants and the parties to the CBA[11] in voluntarily waiving a CBA's pre-arbitration grievance procedures, and, second, whether this waiver contributed to the outcome of the proceedings. Plaintiffs' claim fails when the second question is analyzed.

Assuming *arguendo* that the pre-arbitration grievance procedures were

_____

[10]Bounds alleges that he was "forced" to waive these procedures. Ps. App. 7. But aside from this conclusory statement, plaintiffs assert no additional facts to indicate that the his waiver was compelled or otherwise made under duress. Thus a reasonable jury could only find that Bounds's waiver was voluntary. *See Stagliano v. Cincinnati Ins. Co.*, 633 Fed. Appx. 217, 219 (5th Cir. 2017) (per curiam) ("[W]e think that a single conclusory . . . affidavit, devoid of any factual support . . . was insufficient to meet Plaintiff's burden of designating specific facts showing that there is a genuine issue for trial.") (internal brackets and quotation marks omitted); *see also Orthopedic & Sports Injury Clinic v. Wang Lab. Inc.*, 922 F.2d 220, 224 (5th Cir. 1991) ("[T]here is a level of conclusoriness below which an affidavit must not sink if it is to provide the bases for a genuine issue of material fact.").

[11]APA and American are the parties to the CBA.

nonwaivable—and that permitting their waiver was therefore irrational and arbitrary—the former TWA pilots cannot demonstrate that Bounds's lack of an appeal hearing or PAC contributed to the outcome of the arbitration. This is clear when examining the context of the waiver. By the time Bounds filed his opposition grievance, two of the three legacy American grievances had been pending for over 45 days at the Vice President-Flight appeal stage. They had therefore been "denied" under the terms of the CBA, and APA held the exclusive authority to advance these grievances to arbitration. Bounds agreed to waive the grievance procedures in order to advance and consolidate his grievance—which concerned the same subject matter—with those of the legacy American pilots. Had APA refused to allow Bounds to waive the pre-arbitration grievance procedures and consolidate with the legacy American pilots, the Supplement C grievances would have advanced to the PAC and System Board arbitration without Bounds's participation. Bounds's pre-arbitration grievance procedures simply would have taken place at the same time or after Arbitrator Bloch issued his binding ruling on Supplement C's terms. Therefore, plaintiffs can point to no facts that would enable a reasonable jury to find that the deprivation of the grievance procedures contributed to an erroneous arbitration result.

3

Plaintiffs next contend that APA breached the duty of fair representation when it agreed with American "that the Supplement C grievances would be expedited and heard and decided by a single member System Board . . . without a signed written amendment to the

CBA . . . that was duly approved by its Board of Directors." 2d Am. Compl. 17. They maintain that 45 U.S.C. § 184 of the RLA does not authorize a single-member System Board. Moreover, plaintiffs posit that the CBA itself does not authorize a single-member System Board. They point to the language Section 23 of the CBA, which permits a four or five-member System Board. They contend that no other CBA language permits a single-member board. Plaintiffs also assert that any purported modifications to the CBA System Board provisions did not comply with the APA Constitution and Bylaws because an amendment of the CBA requires approval of the Board of Directors. They therefore maintain that, because Arbitrator Bloch was not authorized to act as a System Board, allowing him to do so was arbitrary and in bad faith.

APA contends that the choice to pursue arbitration before a single-member System Board is not a breach of the duty for fair representation. It notes that LOA 12-05 expressly provides that "Richard Bloch shall have continuing jurisdiction to resolve disputes over implementation and interpretation" of the Supplement C protections. Because LOA 12-05 is a component of the CBA, APA posits that the CBA in fact authorizes Bloch to serve as a single-member System Board. Separately, APA asserts that the RLA cannot bar a single-member System Board Arbitrator because "it does not prescribe what attributes—or how many members—the board must have." APA Br. 30. The court agrees.

A reasonable jury could not find that allowing Arbitrator Bloch to hear the Supplement C grievances as a single arbitrator breached APA's duty of fair representation.

Plaintiffs have failed to introduce evidence that would place this behavior beyond "the wide range of reasonableness" as to be irrational. A single-member System Board is not precluded under the terms of the RLA. Unlike the section governing railway carriers, the text applicable to airlines provides no requirements on the size or number of arbitrators on an individual board. *Compare* 45 U.S.C. § 153 (governing railway carriers) *with* 45 U.S.C. § 184 (governing airlines).

Plaintiffs' contention that 45 U.S.C. § 153 First (n)'s "majority vote" requirement mandates a multi-member board is unavailing because § 153 does not apply to airlines. *See* 45 U.S.C. § 181. But even if it did, a single member board still produces a majority vote. A majority "always refers to more than half of some defined or assumed set." *Majority*, Black's Law Dictionary (9th ed. 2009). When the relevant set is, as here, a single member, that single member casts 100% of the vote—i.e., more than half.[12] Accordingly, courts have permitted single-member System Boards. *See, e.g., Addington v. US Airline Pilots Ass'n*, 588 F.Supp.2d 1051, 1064 (D. Ariz. 2008) (noting that while parties' "Transition Agreement" called for five member system board, "the company and the union have agreed to waive their representatives on this board, so that it would consist of one neutral and one neutral alone for the purposes of these claims").

Neither can plaintiffs demonstrate that submitting the claims to Arbitrator Bloch as

---

[12]This reasoning also precludes plaintiffs' contention that the CBA mandates a multi-member board because it requires System Board decisions to be made by "majority vote." Ps. App. 55. A single-member board meets this requirement.

a single-member System Board was irrational under the CBA. The past practices of a CBA's signatories may inform a party's interpretation of its CBA. *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 311 (1989) (citing *Transp. Union v. Union R.R. Co.*, 385 U.S. 157, 161 (1966)) ("Furthermore, it is well established that the parties' 'practice, usage, and custom' is of significance in interpreting their agreement."). Here, American and APA historically submitted grievances over Supplement CC—the predecessor to Supplement C—to a single neutral arbitrator. This eliminated the possibility that former TWA pilots would be prejudiced by any legacy American pilots serving as the union's representatives on the System Board. Indeed, past cases suggest that such a system was preferred by at least some former TWA pilots. *See McFarland v. Allied Pilots Ass'n*, No. 3:03-CV-0984-B, slip op. at 15 (N.D. Tex. Sept. 22, 2005) (Boyle, J.) (former TWA pilot alleging he was entitled to System Board comprised of single, neutral arbitrator).[13]

Plaintiffs correctly note that Supplement C states that future disputes "will be handled in accordance with the CBA, Sections 21, 22, and 23." Ps. App. 30. These sections call for a four- or five-member system board. At the same time, however, Supplement C provides that "Richard Bloch shall sit as the neutral member of the System Board for disputes arising under this Supplement." *Id.* And LOA 12-05, a component of the controlling CBA,

---

[13]Plaintiffs contend that *McFarland*—holding that the former TWA pilots were not entitled to a single neutral arbitrator—undermines any history of a past practice. But the fact that this particular case was not submitted to a single arbitrator does not indicate that the practice was nonexistent. On the contrary, it confirms that it was an option considered by APA and American, but not pursued in this particular case.

explicitly states that "Richard Bloch shall have continuing jurisdiction to resolve disputes over the implementation and interpretation of the decision by the panel" that would become Supplement C. APA App. 43. LOA 12-05 makes no other mention of additional arbitrators who would have jurisdiction over Supplement C disputes.

Given this CBA text and past practices, a reasonable jury could not find that submitting the Supplement C grievances to Arbitrator Bloch as a single-member System Board was so far outside the range of reasonableness as to be irrational or arbitrary. APA and American had identified Arbitrator Bloch—a member of the panel that crafted the award that became Supplement C—as an arbitrator for disputes about Supplement C in multiple sections of the CBA. Similarly, at a time when the parties had a practice of submitting disagreements over the former TWA pilots' protections to a single arbitrator, American and APA identified only Arbitrator Bloch as the individual who would have jurisdiction in future disputes. Had this grievance been heard by a System Board with APA representatives, it would have been subject to the same risk of past seniority integration grievances: that legacy American representatives would side against Bounds and the former TWA pilots. Thus a reasonable jury could not find that it was arbitrary for APA and American to interpret the CBA as giving them the authority to submit the grievances solely to Arbitrator Bloch.

Moreover, the choice of Arbitrator Bloch as the particular single member of the System Board is not evidence of bad faith. Plaintiffs contend that APA knew that Arbitrator Bloch had ruled against former TWA pilots in previous arbitrations regarding the protections

in Supplement C and Supplement CC. They maintain that, by allowing Arbitrator Bloch to have the sole controlling voice in the Supplement C grievances, APA undermined the integrity of the grievance process and allowed it to proceed in bad faith. But as the language of Supplement C and LOA 12-05 indicate, APA and American selected Arbitrator Bloch to be involved in any Supplement C arbitrations years in advance of the Supplement C grievances. This selection was logical: Arbitrator Bloch would be interpreting the award that he and two other arbitrators had awarded. Separately, the fact that an arbitrator has ruled against a group in the past in insufficient to prove bias against that group. *See Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 330 (6th Cir. 1998) ("An adverse award in and of itself is no evidence of bias absent some evidence of improper motivation."). Accordingly, a reasonable jury could not find that the involvement of Arbitrator Bloch in the Supplement C grievances was discriminatory or bad faith.

The foregoing analysis demonstrates that plaintiffs have not pointed to evidence that would enable a reasonable jury to find that APA breached its duty of fair representation. The court therefore grants APA's motion for summary judgment on count 2. And because plaintiffs cannot succeed on the merits on either count 1 or count 2, the court denies plaintiffs' motion for a preliminary injunction.[14]

_____

[14]To obtain a preliminary injunction, plaintiffs must establish the following: (1) a substantial likelihood that they will prevail on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury outweighs the threatened harm the injunction may do to defendants; and (4) that granting the preliminary injunction will not disserve the public interest. *See, e.g., Jones v. Bush*, 122 F.Supp.2d 713, 718 (N.D. Tex. 2000) (Fitzwater, J.), *aff'd*, 244 F.3d 134 (5th Cir. 2000).

*   *   *

For the reasons explained, the court grants American's and APA's motions to dismiss and dismisses count 1 without prejudice; grants APA's motion for partial summary judgment and dismisses count 2 with prejudice; denies plaintiffs' motions for partial summary judgment and for a preliminary injunction; and dismisses this action by judgment filed today.

**SO ORDERED**.

December 11, 2017.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE